MANUFACTURERS LAND AND IMPROVEMENT COMPANY, PROSECUTOR, v. THE CITY OF CAMDEN ET AL.

Submitted July 12, 1904—Decided November 14, 1904.

1. The common council of the city of Camden has power to appoint commissioners to assess damages to an owner injured by a change of grade of a street by virtue of the act of 1858. *Gen. Stat., p.* 2820.
2. The power contained in the charter of Camden to alter a street does not apply to changes of grade but only to changes of location.
3. The revised Eminent Domain act (*Pamph. L.* 1900, *p.* 79) does not apply to injuries arising from a change of street grade.
4. The power conferred upon common council to appoint "nine commissioners, at least one from each ward," does not warrant the appointment of twelve because the number of wards has increased from eight to twelve.

On *certiorari*.

This writ brings up an appointment of commissioners to make an estimate and assessment of damages and the proceedings of the commissioners. The commissioners were appointed by the common council of the city of Camden in the matter of the alteration of the grade of Broadway and Bulson street in said city.

Before Justices FORT and REED.

For the prosecutor, *Thomas E. French.*

For the city of Camden, *Edwin G. C. Bleakly.*

For the Atlantic City Railroad Company, *Joseph H. Gaskill.*

The opinion of the court was delivered by

REED, J. On March 26th, 1903, the common council of the city of Camden passed an ordinance authorizing a contract between the city and the Atlantic City Railroad Company. The ordinance recited that the company crossed certain streets in the city, and that to depress the railroad and change the grade of Broadway by a bridge over the railroad would secure greater safety to persons and property. It therefore, in pursuance of "An act to authorize any town or city to enter into contract with railroad companies whose road entered their corporate limits to change or elevate their railroads, and when necessary for that purpose, to vacate, change the grade of or alter the lines of any street or highway therein," approved March 20th, 1901 (*Pamph. L., p.* 116), it was agreed that the railroad company might depress its tracks at Broadway and Bulson street and in the vicinity thereof, and in order to provide an overhead crossing, the grades, lines and location of Broadway, where the same now crosses or lies along side of the railroad, be changed in accordance with the plan annexed to the ordinance.

The ordinance raised the grade of Broadway, at Bulson street, sixteen and three-quarters feet, with a descending grade on either side of four per cent. until the descending grade should join the present grade.

On November 25th, 1903, the common council, by resolution, directed the city street commissioner to give notice to owners of real estate necessary to be taken for changing the grade of Broadway and Bulson street, and directed that the evening of December 10th, 1903, at eight o'clock, in the city hall, be fixed as the time and place where a public hearing

would be given to said owners and all persons interested. It was resolved that the street commissioner be designated to treat with the owners of real estate respecting the damages, and that in case any owner should refuse to treat, or the amount of damages could not be agreed upon, that the common council proceed to make an assessment of damages. At that meeting a communication was read from the attorney of the prosecutor, objecting to the plan proposed. An ordinance was then passed, December 10th, 1903, changing the grade of Broadway and authorizing the railroad company to proceed with the execution of the work connected with the change of grade. On December 31st, 1903, the street commissioner reported to the common council, among other matters, that he was unable to treat with the prosecutor. It was at that meeting resolved that the evening of January 7th, 1904, be fixed for a public hearing upon the report of the street commissioner and on the amount of damages to be awarded, and also for treating with any owner respecting his damages. The street commissioner was also directed to give notice of this meeting.

At that meeting, after the street commissioner had deposed that he had given the required notices, and the prosecutor and others not appearing, it was resolved to appoint as commissioners to make an assessment of damages twelve persons named, one from each of the twelve wards of the city.

On January 28th, 1904, the common council fixed February 19th, 1904, at eleven o'clock, at the highway department, as the time and place of the meeting of the commissioners, and it directed the city clerk to give legal notice of the meeting.

On March 31st, 1904, the commissioners made their report, reciting the appearances before them at the time and place mentioned in the previous resolution of the attorney of the prosecutor.

This report was at that meeting, March 31st, 1904, confirmed by the common council.

The rule to show cause why a writ of *certiorari* should not be allowed was entered March 18th, and the writ was allowed on March 31st, 1904.

There are eleven reasons assigned for setting aside the appointment of the commissioners to assess damages. Of these some are not pursued in the argument and others are grounded upon alleged defects in the procedure, which have been waived by delay in attack or by the conduct of the prosecutor.

The most important of the reasons is the one which challenges the right of the common council under the existing law to appoint commissioners at all to assess damages for change of grade.

The insistence is that the appointment of commissioners for this purpose is to be found in "An act to regulate the ascertainment and payment of compensation for property condemned or taken for public use." *Pamph. L.* 1900, *p.* 79.

The counsel for the city insists, first, that power to make this assessment resides in the common council by virtue of the provisions of section 79 of the city charter.

The charter of the city contains, in section 79, a provision for an assessment of damages to landowners resulting from certain municipal dealings with the subject of streets.

The kind of improvement authorized by section 79 to be made, and for which damages are to be assessed, are included within the power given to the common council in these words: "To lay out and open any street, road or highway in any part of said city, and to cause any street, road, highway or alley already laid out to be vacated, opened, altered, widened," &c.

This language, in my judgment, does not include the mere change of grade.

The counsel for the city insists that a power to alter grades is included in the word "altered," so that the power to cause a street to be altered includes an alteration of grade.

Doubtless a street may be said to be altered when its surface is raised or depressed. The question, however, is what the legislature meant by the use of this word in the charter. In my judgment, it meant change of location, and not of grade. This is the natural and adjudicated significance of

the word when used in connection with roads or streets. *Commonwealth* v. *Inhabitants of West Borough,* 3 *Mass.* 406; *Commonwealth* v. *Cambridge,* 7 *Id.* 158.

The word "alteration" was employed in Judge Paterson's act, passed in 1799 (*Pat. L., p.* 387), entitled "An act relative to the laying out, vacating and altering roads."

The word has been employed in all the later acts. The present statute (*Gen. Stat., p.* 2829, § 119) provides for an application for the appointment of surveyors where a road is proposed "to be laid out, vacated or altered."

The meaning always attributed to the word "alteration" was change of route. Where it is effected by vacating a part of an old road and retaining a part, it is to be done in a single application. *State* v. *Bergen,* 1 *Zab.* 342; *Green* v. *Loudenslager,* 25 *Vroom* 478.

No one ever dreamed of applying to the court to appoint surveyors to authorize a change of grade in a highway.

So damages were first provided for in the act of 1860 (*Gen. Stat., p.* 2809, § 13) to any owner of land or real estate other than an applicant for the same. It was such damages as the owner would sustain by "laying out or altering a road."

The surveyors appointed to lay out or alter were directed to assess such damages, thus exhibiting the intention to be that only such alterations as it was necessary to have executed by means of surveyors, were included.

That a change of grade did not require such action is apparent from the act of 1882 (*Gen. Stat., p.* 2918, § 471), providing for the establishment of a road grade by the voters of the township.

It is also apparent, from the fact that in 1885 (*Gen. Stat., p.* 2820, § 70 *et seq.*) the legislature had given to the owner of any house or other buildings standing or erected upon any street or highway, the grade whereof should be or should have been altered by virtue of an ordinance, resolution or other proceeding of the legislative authority of a city, borough or town corporation, the right to recover all damages which such owner should suffer by reason of the alteration of such grade.

In the case of *Town of Lambertville* v. *Clevinger,* 1 *Vroom* 53, and in other cases, actions were brought to recover damages resulting from a change of grade. These actions, however, were based upon the terms of this act or upon some charter provision providing for damages resulting from an alteration of grade. In no instance was it suggested that such an action would lie at common law, or that a property owner was entitled to damages under the act of 1860, providing for damages for the alteration of a road.

Not alone from the use of the words "altered" and "alterations," in the preceding acts, does it appear that they were used to signify changes of route alone, but it seems to be apparent from the charter itself, for the matter of grading appears, in sections 76 and 77 of the charter, entirely disconnected from section 79, respecting alterations.

My conclusion is that the power to assess for change of grade does not appear in the charter of Camden.

The question remains, does it appear in any other legislation? As already remarked, in 1858 an act was passed (*Gen. Stat.,* p. 2820) providing that an action upon the case should lie in behalf of any person owning any house or other building standing and erected upon any street or highway the grade whereof should have been altered by virtue of any proceeding of the legislative body of any municipal corporation, to recover all damages which such owner should suffer by reason of altering such grade. The third section of the act, providing that the preceding provisions should not refer to any municipal corporation whose charter then existed, or which should thereafter be passed, provided for assessing and paying compensation to persons injured by the making of grades established or to be established. Inasmuch as it appears that the charter of Camden does not provide for assessing and paying compensation for change of grade, the preceding provisions of this act apply to it. The fifth section of this act provided that the damages mentioned in the act to be paid to such owners should be assessed upon and paid by the land and real estate benefited thereby, and that such

damages should be ascertained, estimated and assessed, and the amount thereof should afterwards be justly and equitably assessed and apportioned upon the lands and real estate benefited thereby, by commissioners to be appointed, and who should act in all cases in the same manner as now provided in the respective charters of the several cities, boroughs and towns corporate in this state, for the laying out, opening, altering or widening any street, highway, road or alley, and all proceedings in such matters should be in conformity with and analogous to the proceeding directed and the privileges allowed in such charters; and such provisions were thereby extended and made applicable in all things to the estimating, payment, apportionment and collection of such damages in the same manner as if such subject had originally been embraced therein.   The charter of Camden, which preceded the present charter of 1871, and which was in existence when this act of 1858 was passed, had the same provision for the assessment of damages for laying out, opening, altering and widening any street as is now contained in section 79 of the present charter.

Under the act of 1858, therefore, damages for change of grade in the city of Camden were assessable in the same manner as damages for the laying out, &c., of any street.

In 1889 (*Pamph. L., p.* 378), an act was passed providing that where any city in this state had power to change the grade of any street or part of a street upon which any house or other building stood or was erected, it should be lawful for the municipal authorities in any such city, through its proper officers, to make or cause to be made proper awards for damages, if any, ensuing or arising to the owner or owners of any such house or other building standing or erected upon any such street or part of a street, the grade whereof is changed.   It. also provided that the damages should be assessed upon and paid by the lands and real estate benefited thereby, by such municipal authority, through its proper officers.

The effect of this act was to incorporate into every city

charter a provision for assessing and paying compensation to persons injured by the making of grades, and so excluded the operation of sections 1 and 2 of the act of 1858, by force of section 3 of the act of 1858. The method of assessing damages is not prescribed, except that it shall be done through the proper officers of the municipality. The proper officers of the municipality were, under the act of 1858, in those cities not providing a different method, those empowered to have damages assessed for the laying out, opening or widening of streets. These are the officers empowered to assess damages in the city of Camden, unless the common council is stripped of that power by force of the act of 1900 (*Pamph. L., p.* 79), entitled "An act to regulate the ascertainment and payment of compensation for property condemned or taken for public use." This is the revised act, intended to cover all cases of taking by eminent domain. The language of the first section of the act is that whenever the proper officers of the state, or of any county, or of any municipal corporation, or of any other corporation, public or private, having power to take lands or other property for public use, shall have determined to acquire land or other property pursuant to authority conferred by law, and cannot secure such land or other property by agreement with the owner, &c., the compensation shall be ascertained by the appointment of commissioners by a justice of the Supreme Court.

I am of the opinion that this act does not comprehend the assessment of damages for a change in the grade of a street or highway. A change of grade was never regarded as the taking of private property within the purview of the constitutional restriction. The incidental injury resulting to the abutter from the change of grade, a right to the payment of damages for which is the creature of statute, was not within the legislative view as disclosed by the language of the act. The language of section 2, requiring a description of the land or property and the names of its owners and occupants, and section 7, respecting the right to said property acquired

upon payment or tender of the award, seem inconsistent with any other view.

If, however, the act includes the assessment of damages for change of grade, the present assessment seems to come within the exception to be found in section 17. of the act of 1900. If the change of grade can be regarded as the taking of land or other property, then the method of assessment provided for in the city charter seems to bring it within the language of the exception. The clause containing the exception provides that the practice prescribed in this act (of 1900) shall supersede the existing practice in all condemnation cases for the ascertainment of compensation, except in cases of the taking of land for a public improvement where payment of the award for land taken and damages is authorized by statute to be set off against or met wholly or partially in benefits to be assessed for the same improvement, in which case the procedure prescribed by this act shall not be exclusive of the procedure authorized by such statutes, and the municipal corporation or other public body taking land for a public improvement may elect to proceed under such statute, and on such election the procedure prescribed by·this act shall not apply to such taking. Section 79 of the charter of Camden provides that in estimating or assessing damages the commissioners shall have due regard as well to the value of the land or other real estate with the appurtenances as to the injury or benefit to the owner or owners thereof. This clause permitting the application of benefits to injuries seems to confer upon the common council of Camden the right to elect whether it will proceed in making assessment under the act of 1900 or under its charter provision, as aided by the act of 1858.

The conclusion is that there resides a power in the common council to appoint commissioners to assess damages to the owners of dwellings and buildings standing on streets or parts of streets the grade of which is changed.

Another reason attacks the appointment of twelve commissioners instead of nine to make this assessment. Section

79 of the charter provides that it shall be lawful for the common council to appoint nine disinterested freeholders of the said city, at least one from each ward, as commissioners to make an estimate and assessment of the damages, &c. In this instance, because there were twelve wards in the city, it was supposed that the language of section 79 required the appointment of twelve commissioners, one from each ward. I think this construction of the charter was erroneous. When the preceding charter of 1851 was passed there were three wards and the charter provided for five commissioners, at least one from each ward. When the present charter of 1871 was passed there were eight wards and, as already appears, the charter required nine commissioners, at least one from each ward. The purpose of that was not to secure absolute equality in representation but as near it as the appointment of the stated number of commissioners would permit. The controlling word was the word "nine." The legislature obviously did not have in view the increase of the number of wards beyond nine; if it had meant that when the number of wards increased so that there were more than nine there should be one appointed from each ward, the clause would have read "nine, or at least one from each ward," or "never less than one from each ward." The language was used, having in view the then existing condition of affairs, and meant that while one ward must have two the nine commissioners should be so distributed as to give each ward at least one. When the condition changed so that it was impossible to give each ward one, that portion of the direction became impossible and could only be carried out as nearly as possible by giving not more than one to any one ward. I think therefore that the appointment of twelve commissioners was erroneous.

Respecting the other reasons, they seem to be unsubstantial, or, if possessing substance, the defects at which they are aimed must be regarded as waived by the prosecutor by reason of his delay in procuring his writ.

The appointment of twelve instead of nine commissioners,

however, is a more serious matter. By the appointment a body was organized in excess of any statutory authority.

An obligation to abide by an assessment made by these commissioners should not be imposed upon a landowner unless by clear consent or by conduct which amounts to an estoppel.

In most cases where a prosecutor has been held to have waived his right to attack municipal proceedings by reason of delay the step in municipal proceeding attacked is such that, if vacated, it will leave the expenses of a public improvement otherwise assessable upon landowners an entire burden upon the public. A prosecutor, who knows that such expense is being incurred, cannot wait.

In this case the only expenses incurred was in the proceeding of the commissioners themselves in making an assessment.

The writ was applied for before the report was made, and I think the prosecutor is not barred by delay.